## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | |
|---|---|
| **GREGORY HASH**, on behalf of himself and all others similarly situated, <br><br>             Plaintiff, <br><br> v. <br><br> **FIRST FINANCIAL BANCORP, FORMERLY MAINSOURCE BANK**, <br><br>       Defendant. | Case No. 1:20-cv-01321 |

## CLASS ACTION COMPLAINT

Plaintiff, Gregory Hash, on behalf himself and all others similarly situated, by counsel, alleges:

### INTRODUCTION

1.  Plaintiff brings this action on behalf of himself and a class of all similarly situated Hoosiers against Defendant Mainsource Bank, which has since been acquired by First Financial Bancorp ("Mainsource") over a practice that breached Mainsource's contracts and/or was deceptive and designed to unfairly increase Mainsource's fee revenue at the expense of its members.

2.  MainSource Bank was a community bank located in Greensburg, Indiana. The bank was the operating subsidiary of the MainSource Financial Group. It operated banks in Indiana, Illinois, Kentucky, and Ohio. On May 25, 2018, all MainSource locations closed as part of the acquisition by First Financial Bancorp.

3.  Before it ceased operation, Mainsource charged accountholders $37 overdraft fees ("OD Fees") on accounts that were never actually overdrawn.

4.      Plaintiff and other Mainsource customers have been injured by Mainsource practices and have had improper fees assessed against and collected from their accounts by Mainsource.

## PARTIES

5.      Plaintiff Gregory Hash is a natural person and citizen of Johnson County, Indiana. He was a Mainsource customer who was improperly charged improper fees by Mainsource.

6.      Defendant First Financial Bancorp is a regional bank headquartered in Cincinnati, Ohio, with $18 billion in assets.

## JURISDICTION AND VENUE

7.      This Court has original jurisdiction over this putative class action lawsuit pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. §§ 1332(d)(2) & (6), because the aggregate sum of the claims of the members of the putative class exceeds $5 million, exclusive of interest and costs, because Plaintiff brings this action on behalf of a proposed class that is comprised of over one hundred members, and because at least one of the members of the proposed class is a citizen of a different state than First Financial Bancorp.

8.      This Court has personal jurisdiction over Mainsource because Mainsource conducted busi9ness in and throughout the Southern District of Indiana at all times material hereto.

9.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(3) in that Defendant is subject to personal jurisdiction in this District.

## FACTS

## I.      MAINSOURCE ASSESSED OD FEES ON ACCOUNTS THAT WERE NOT OVERDRAWN.

10.     Plaintiff had a checking account with Mainsource.

11.     Plaintiff brings this cause of action challenging Mainsource's practice of charging OD Fees on what are referred to in this complaint as "Authorize Positive, Settle Negative Transactions" ("APSN Transactions").

12.     Here is how it works. At the moment debit card transactions are authorized on an account with positive funds to cover the transaction, Mainsource immediately reduces accountholders' checking accounts for the amount of the purchase, sets aside funds in a checking account to cover that transaction, and as a result, the accountholder's displayed "available balance" reflects that subtracted amount. As a result, customers' accounts will always have sufficient available funds to cover these transactions because Mainsource has already sequestered these funds for payment.

13.     However, Mainsource still assesses crippling OD Fees on many of these transactions and misrepresents its practices in its account documents.

14.     Despite putting aside sufficient available funds for debit card transactions at the time those transactions are authorized, Mainsource later assesses OD Fees on those same transactions when they purportedly settle days later into a negative balance. These types of transactions are APSN Transactions.

15.     Mainsource maintains a running account balance, tracking funds accountholders have for immediate use. This running account balance is adjusted, in real-time, to account for debit card transactions at the precise instance they are made. When a customer makes a purchase with a debit card, Mainsource sequesters the funds needed to pay the transaction, subtracting the dollar amount of the transaction from the customer's available balance. Such funds are not available for any other use by the accountholder, and such funds are specifically associated with a given debit card transaction.

16.     That means when any subsequent, intervening transactions are initiated on a checking account, they are compared against an account balance that has already been reduced to account for any earlier debit card transactions. This means that many subsequent transactions incur OD Fees due to the unavailability of the funds sequestered for those debit card transactions.

17.     Still, despite keeping those held funds off-limits for other transactions, Mainsource improperly charges OD Fees on those APSN Transactions, although the account *always* has sufficient funds to cover such APSN Transactions.

18.     Indeed, the Consumer Financial Protection Bureau ("CFPB") has expressed concern with this very issue, flatly calling the practice "unfair" and/or "deceptive" when:

> A financial institution authorized an electronic transaction, which reduced a customer's available balance but did not result in an overdraft at the time of authorization; settlement of a subsequent unrelated transaction that further lowered the customer's available balance and pushed the account into overdraft status; and when the original electronic transaction was later presented for settlement, because of the intervening transaction and overdraft fee, the electronic transaction also posted as an overdraft and an additional overdraft fee was charged. Because such fees caused harm to consumers, one or more supervised entities were found to have acted unfairly when they charged fees in the manner described above. Consumers likely had no reason to anticipate this practice, which was not appropriately disclosed. They therefore could not reasonably avoid incurring the overdraft fees charged. Consistent with the deception findings summarized above, examiners found that the failure to properly disclose the practice of charging overdraft fees in these circumstances was deceptive. At one or more institutions, examiners found deceptive practices relating to the disclosure of overdraft processing logic for electronic transactions. Examiners noted that these disclosures created a misimpression that the institutions would not charge an overdraft fee with respect to an electronic transaction if the authorization of the transaction did not push the customer's available balance into overdraft status. But the institutions assessed overdraft fees for electronic transactions in a manner inconsistent with the overall net impression created by the disclosures. Examiners therefore concluded that the disclosures were misleading or likely to mislead, and because such misimpressions could be material to a reasonable consumer's decision-making and actions, examiners found the practice to be deceptive. Furthermore, because consumers were substantially injured or likely to be so injured by overdraft fees assessed contrary to the overall net impression created by the disclosures (in a manner not outweighed by countervailing benefits to consumers or competition), and because consumers could not reasonably avoid the fees (given the misimpressions created

4

by the disclosures), the practice of assessing fees under these circumstances was found to be unfair.

Consumer Financial Protection Bureau, *Supervisory Highlights*, (Winter 2015).

19.    There is no justification for these practices, other than to maximize Mainsource's OD Fee revenue. APSN Transactions only exist because intervening checking account transactions supposedly reduce an account balance. But Mainsource is free to protect its interests and either reject those intervening transactions or charge OD Fees on those intervening transactions—and it does the latter to the tune of millions of dollars each year. But Mainsource was not content with these millions in OD Fees. Instead, it sought millions *more* in OD Fees on these APSN Transactions.

20.    Besides being unfair and unjust, these practices breach contract promises made in Mainsource's adhesion contracts—contracts which fail to inform accountholders about the true nature of Mainsource's processes and practices. These practices also exploit contractual discretion to gouge accountholders.

21.    In plain, clear, and simple language, the checking account contract documents covering OD Fees promise that Mainsource will only charge OD Fees on transactions that have insufficient funds to cover that debit card transaction.

22.    In short, Mainsource is not authorized by contract to charge OD Fees on transactions that have not overdrawn an account, but it has done so and continues to do so.

### A.  **Mechanics of a Debit Card Transaction**

23.    A debit card transaction occurs in two parts. First, authorization for the purchase amount is instantaneously obtained by the merchant from Mainsource. When a merchant physically or virtually "swipes" a customer's debit card, the credit card terminal connects, via an

intermediary, to Mainsource, which verifies that the customer's account is valid and that sufficient available funds exist to "cover" the transaction amount.

24.     At this step, if the transaction is approved, Mainsource immediately decrements the funds in an accountholder's account and sequesters funds in the amount of the transaction, but does not yet transfer the funds to the merchant.

25.     Indeed, the entire purpose of the immediate debit and hold of positive funds is to ensure that there are enough funds in the account to pay the transaction when it settles, as discussed in the Federal Register notice announcing revisions to certain provisions of the Truth in Lending Act regulations:

> When a consumer uses a debit card to make a purchase, a hold may be placed on funds in the consumer's account to ensure that the consumer has sufficient funds in the account when the transaction is presented for settlement. This is commonly referred to as a "debit hold." During the time the debit hold remains in place, which may be up to three days after authorization, those funds may be unavailable for the consumer's use for other transactions.

Federal Reserve Board, Office of Thrift Supervision, and National Credit Union Administration, Unfair or Deceptive Acts or Practices, 74 FR 5498-01 (Jan. 29, 2009).

26.     Sometime thereafter, the funds are actually transferred from the customer's account to the merchant's account.

27.     Mainsource (like all banks) decides whether to "pay" debit card transactions at authorization. After that, the Bank is obligated to pay the transaction no matter what. For debit card transactions, that moment of decision can only occur at the point of sale, at the instant the transaction is authorized or declined. It is at that point—and only that point—when the Bank may choose to either pay the transaction or decline it. When the time comes to actually settle the transaction, it is too late—the financial institution has no discretion and must pay the charge. This "must pay" rule applies industry wide and requires that, once a financial institution

authorizes a debit card transaction, it "must pay" it when the merchant later makes a demand, regardless of other account activity. *See* Electronic Fund Transfers, 74 Fed. Reg. 59033-01, 59046 (Nov. 17, 2009).

28.     There is no change—no impact whatsoever—to the available funds in an account when this step occurs.

### B.  Mainsource's Account Contract

29.     Plaintiff had a Mainsource checking account, which was governed by Mainsource's standardized "Terms and Conditions of Your Account" ("Deposit Agreement"), Ex. A, and "What You Need to Know about Overdrafts and Overdraft Fees" ("Overdraft Disclosure"), Ex. B.

30.     The Deposit Agreement expressly promises that it uses a consumer's "available balance" to determine when an overdraft occurs, and that "holds" are immediate placed on point of sale debit card transactions at the moment of authorization:

> [W]e will only authorize and pay overdrafts for ATM transactions or debit card transactions if you specifically opted-in to Courtesy Cash Plus service, **or there are available funds at the time of authorization**.
>
> . . .
>
> In order to determine whether your account is overdrawn, we use the Available Balance . . . . **When you make a point-of-sale transaction, a hold is placed on those funds at the time the transaction is authorized.** If a point-of-sale hold expires and the point-of-sale transaction has not yet been paid, the amount being held is then returned to your Available Balance.

Ex. A at 2 (emphasis added).

31.     The Overdraft Disclosure, Ex. B, reiterates that an overdraft occurs when there are insufficient funds "to cover" a transaction and that an overdraft is determined when a Bank "authorizes and pays" a debit card transaction:

An overdraft occurs when you do not have enough money in your account to cover a transaction, but we pay it anyway.

. . .

What are the standard overdraft practices that come with my account?

We <u>do</u> authorize and pay overdrafts for the following types of transactions:

> • Checks and other transactions made using your checking account number
> • Automatic bill payments

We <u>do not</u> authorize and pay overdrafts for the following types of transactions unless you ask us to (see below):

> • ATM transactions
> • ATH debit card transactions

. . .

If you also want us to authorize and pay overdrafts on ATM and everyday debit card transactions, please check the appropriate section below . . .

Ex. B (emphasis in original).

32.     For APSN Transactions, which are immediately deducted from a positive account balance and held aside for payment of that same transaction, there are always sufficient funds to cover those transactions—yet Mainsource assesses OD Fees on them anyway.

33.     The above promises indicate that transactions are only overdraft transactions when they are authorized into a negative account balance. Of course, that is not true for APSN Transactions. APSN transactions are always authorized at the time the customer swipes the debit card when there are sufficient available funds in the account.

34.     In fact, Mainsource actually authorizes transactions on positive funds, sets those funds aside on hold, then fails to use those same funds to settle those same transactions. Instead, it uses a secret posting process described below.

35.     All the above representations and contractual promises are untrue. In fact, Mainsource charges OD Fees even when sufficient funds exist to cover transactions that are authorized into a positive balance. No express language in any document states that Mainsource may impose OD Fees on any APSN Transactions.

36.     The account documents misconstrue Mainsource's true debit card processing and overdraft practices.

37.     First, and most fundamentally, Mainsource charges OD Fees on debit card transactions for which there are sufficient funds available to cover the transactions throughout their lifecycle. That is despite contractual representations that Mainsource will only charge OD Fees on transactions with insufficient available funds to cover a given transaction.

38.     Mainsource's practice of charging OD Fees even when sufficient available funds exist to cover a transaction violates a contractual promise not to do so. This discrepancy between Mainsource's actual practice and the contract causes accountholders like the Plaintiff to incur more OD Fees than they should.

39.     Next, sufficient funds for APSN Transactions are actually debited from the account immediately, consistent with standard industry practice.

40.     Because these withdrawals take place upon initiation, they cannot be re-debited later. But that is what Mainsource does when it re-debits the account during a secret batch posting process.

41.     Mainsource's actual practice is to assay the same debit card transaction twice to determine if the transaction overdraws an account—both at the time a transaction is authorized and later at the time of settlement.

42.     At the time of settlement, however, an available balance *does not change at all* for these transactions previously authorized into good funds. As such, Mainsource cannot then charge an OD Fee on such transaction because the available balance has not been rendered insufficient due to the pseudo-event of settlement.

43.     Upon information and belief, something more is going on: at the moment a debit card transaction is getting ready to settle, Mainsource does something new and unexpected during its nightly batch posting process. Specifically, Mainsource releases the hold placed on funds for the transaction for a split second, putting money back into the account, then re-debits the same transaction a second time.

44.     This secret step allows Mainsource to charge OD Fees on transactions that never caused an overdraft—transactions that were authorized into sufficient funds and for which Mainsource specifically set aside money to pay them.

45.     This discrepancy between Mainsource's actual practices and the contract causes accountholders to incur more OD Fees than they should.

46.     In sum, there is a huge gap between practices as described in the account documents and Mainsource's actual practices.

### C.  Mainsource Abuses Contractual Discretion

47.     Mainsource's treatment of debit card transactions to charge OD Fees is not simply a breach of the express terms of the numerous account documents. In addition, Mainsource exploits contractual discretion to the detriment of accountholders when it uses these policies.

48.     Mainsource's account documents never define key terms such as "to cover" or "hold."

49.     Contrary to accountholders' reasonable expectations, Mainsource uses its contractual discretion to define these terms in a surprising, counterintuitive way that is contrary to any reasonable, common sense understanding of those terms.

50.     Moreover, Mainsource uses its contractual discretion to cause APSN Transactions to incur OD Fees by knowingly authorizing later transactions that it allows to consume funds previously sequestered for APSN Transactions.

51.     Mainsource uses these contractual discretion points unfairly to extract OD Fees on transactions that no reasonable accountholder would believe could cause OD Fees.

### D.    Reasonable Accountholders Understand Debit Card Transactions are Debited Immediately

52.     The assessment of OD Fees on APSN Transactions is fundamentally inconsistent with immediate withdrawal of funds for debit card transactions. That is because if funds are immediately debited, they cannot be depleted by intervening transactions (and it is that subsequent depletion that is the necessary condition of APSN Transactions). If funds are immediately debited, then, they are necessarily applied to the debit card transactions for which they are debited.

53.     Mainsource was and is aware that this is precisely how accountholders reasonably understand debit card transactions to work.

54.     Mainsource knows that many accountholders prefer debit cards for these very reasons. Research indicates that accountholders prefer debit cards as a budgeting device because they do not allow debt like credit cards do, and because the money comes directly out of a checking account.

55.     Consumer Action, a national nonprofit consumer education and advocacy organization, advises consumers determining whether they should use a debit card that "[t]here is

no grace period on debit card purchases the way there is on credit card purchases; the money is immediately deducted from your checking account. Also, when you use a debit card you lose the one or two days of 'float' time that a check usually takes to clear." *What Do I Need to Know About Using a Debit Card?,* Consumer Action (Jan. 14, 2019), https://www.consumer-action.org/helpdesk/articles/what_do_i_need_to_know_about_using_a_debit_card.

56.    Further, Consumer Action informs consumers that "Debit cards offer the convenience of paying with plastic without the risk of overspending. When you use a debit card, you do not get a monthly bill. You also avoid the finance charges and debt that can come with a credit card if not paid off in full." *Understanding Debit Cards*, Consumer Action, http://www.consumer-action.org/english/articles/understanding_debit_cards (last visited May 5, 2020).

57.    This understanding is a large part of the reason that debit cards have risen in popularity. The number of terminals that accept debit cards in the United States has increased by approximately 1.4 million in the last five years, and with that increasing ubiquity, consumers have (along with credit cards) viewed debit cards "as a more convenient option than refilling their wallets with cash from an ATM." Maria LaMagna, *Debit Cards Gaining on Case for Smallest Purchases,* MarketWatch (Mar. 23, 2016), http://www.marketwatch.com/story/more-people-are-using-debit-cards-to-buy-a-pack-of-gum-2016-03-23.

58.    Not only have accountholders increasingly transitioned from cash to debit cards, but they believe that a debit card purchase is the fundamental equivalent of a cash purchase, with the swipe of a card equating to handing over cash, permanently and irreversibly.

59.     Mainsource was aware of accountholders' perception that debit transactions reduce an available balance at a specified time—namely, the moment they are actually initiated—and its account agreement only supports this perception.

**E.  Plaintiff's Debit Card Transactions**

60.     As examples, on October 14, 2015 and October 19, 2015, Plaintiff was assessed OD Fees in the amount of $37.00 each for debit card transactions that settled on those days, despite the fact that positive funds were immediately deducted and placed on "hold" prior to those days, when the transactions were authorized. Moreover, those funds remained on "hold" at the time the transactions settled.

## CLASS ALLEGATIONS

61.     Plaintiff brings this action on behalf of himself and as a class action on behalf of the following proposed class (the "Class"):

> All Indiana citizens with a Mainsource checking account on or after ten years prior to the filing of this lawsuit who were charged an OD Fee on a transaction that did not overdraw their checking accounts.

62.     Plaintiff reserves the right to modify or amend the definition of the Class as this litigation proceeds.

63.     Excluded from the Class are Mainsource, its parents, subsidiaries, affiliates, officers and directors, any entity in which Mainsource has a controlling interest, all customers who make a timely election to be excluded, governmental entities, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

64.     This action is properly maintainable as a class action under Federal Rule 23(a), (b)(2) and (b)(3).

65.     The class consists of thousands of members, such that joinder of all Class members is impracticable.

66.    There are questions of law and fact that are common to the Class members that relate to Mainsource's practice of charging OD Fees on transactions that did not overdraw accounts.

67.    The claims of the Plaintiff are typical of the claims of the proposed Class because they are based on the same legal theories, and Plaintiff has no interests that are antagonistic to the interests of the Class members.

68.    The Plaintiff is an adequate representative of the Class and has retained competent legal counsel experienced in class actions and complex litigation.

69.    The questions of law and fact common to the Class predominate over any questions affecting only individual Class members, particularly because the focus of the litigation will be on Mainsource's conduct and its improper fees. The predominant questions of law and fact in this litigation include, but are not limited to, whether Mainsource:

- Imposed OD Fees on transactions when those transactions did not overdraw accounts.

- Breached its contract with Plaintiff and Class members.

- Breached the covenant of good faith and fair dealing imposed on it.

- Violated the Indiana Deceptive Consumer Sales Act.

70.    Other questions of law and fact common to the Class include the proper method or methods by which to measure damages.

71.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy, as the pursuit of hundreds of individual lawsuits would not be economically feasible for individual Class members, and certification as a class action will preserve judicial resources by allowing the common issues of the Class members to be adjudicated in a single forum, avoiding the need for duplicative hearings and discovery in

individual actions that are based on an identical set of facts. Since the amount of each individual Class member's claim is small relative to the complexity of the litigation, and due to the financial resources of Mainsource, no Class member could afford to seek legal redress individually for the claims alleged herein. Therefore, absent a class action, the Class members will continue to suffer losses and Mainsource's misconduct will proceed without remedy. In addition, without a class action, it is likely that many members of the Class will remain unaware of Mainsource's conduct and the claims they may possess.

72.    It appears that other persons who fall within the Class definition set forth above are not pursuing similar litigation, such that individual Class members do not wish to control the prosecution of separate actions.

73.    This proposed class action does not present any unique management difficulties.

**FIRST CLAIM FOR RELIEF**
**BREACH OF CONTRACT, INCLUDING**
**THE COVENANT OF GOOD FAITH AND FAIR DEALING**
**(On behalf of Plaintiff and the Class)**

74.    Plaintiff incorporates the preceding paragraphs of this Complaint as if fully set forth below.

75.    Plaintiff and Mainsource have contracted for bank account deposit, checking, ATM, and debit card services.

76.    All contracts entered into by Plaintiff and Mainsource are identical or substantively identical because Mainsource's standardized Deposit Agreement and Overdraft Disclosure were used uniformly.

77.    Mainsource breached express promises included in the account documents when it charged OD Fees on transactions that did not overdraw checking accounts as described herein.

78.     Plaintiff and members of the Class have performed all, or substantially all, of the obligations imposed on them under the contract.

79.     Plaintiff and members of the Class have sustained damages as a result of Mainsource's breach of the contract.

80.     Indiana imposes a duty of good faith and fair dealing on contracts between banks and their customers because banks and credit unions are inherently in a superior position to their checking account holders because, from a superior vantage point, they offer customers contracts of adhesion, often with terms not readily discernible to a layperson.

81.     Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form. Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

82.     Mainsource has breached the covenant of good faith and fair dealing in the contract through its policies and practices as alleged herein.

83.     Plaintiff and members of the Class have performed all, or substantially all, of the obligations imposed on them under the account documents.

84.     Plaintiff and members of the Class have sustained damages as a result of Mainsource's breach of the contract, including the covenant of good faith and fair dealing.

**SECOND CLAIM FOR RELIEF**
**VIOLATION OF THE INDIANA DECEPTIVE CONSUMER SALES ACT**
**(On behalf of Plaintiff and the Class)**

85.     Plaintiff incorporates the preceding paragraphs of this Complaint as if fully set forth below.

86.     The purposes and policies of the Indiana Deceptive Consumer Sales Act (the "DCSA"), Indiana Code § 24-5-0.5-1 to -12, are to:

(1) simplify, clarify, and modernize the law governing deceptive and unconscionable consumer sales practices;

(2) protect consumers from suppliers who commit deceptive and unconscionable consumer sales practices; and

(3) encourage the development of fair consumer sales practice.

Ind. Code § 24-5-0.5-1(b).

87.     The General Assembly has instructed courts to construe the DCSA liberally to promote these purposes and policies. Ind. Code § 24-5-0.5-1(a).

88.     Mainsource is a "supplier" as defined in the DCSA because it is a seller or other person who regularly engages in or solicits consumer transactions, which are defined to include sales of personal property, services, and intangibles that are primarily for a personal, familial, or household purpose, such as those at issue in this action. Ind. Code § 24-5-0.5-2(1), (3).

89.     The DCSA provides that "[a] supplier may not commit an unfair, abusive, or deceptive act, omission, or practice in connection with a consumer transaction. Such an act, omission, or practice by a supplier is a violation of [the DCSA] whether it occurs before, during, or after the transaction. An act, omission, or practice prohibited by this section includes both implicit and explicit misrepresentations." Ind. Code § 24-5-0.5-3(a).

90.     The DCSA further provides that:

[w]ithout limiting the scope . . . the following acts, and the following representations as to the subject matter of a consumer transaction, made orally, in writing, or by electronic communication, by a supplier, are deceptive acts:

17

(1) That such subject of a consumer transaction has sponsorship, approval, performance, characteristics, accessories, uses, or benefits it does not have which the supplier knows or should reasonably know it does not have.

(2) That such subject of a consumer transaction is of a particular standard, quality, grade, style, or model, if it is not and if the supplier knows or should reasonably know that it is not. . . .

Ind. Code § 24-5-0.5-3(b).

91.    Mainsource committed deceptive acts, including but not limited to:

a.    Representing that its bank account deposit, checking, ATM, and debit card services had sponsorship, approval, performance, characteristics, accessories, uses, or benefits they did not have which Mainsource knew or should reasonably have known it does not have;

b.    Representing that its bank account deposit, checking, ATM, and debit card services were of a particular standard, quality, grade, style, or model, when they were not and when Mainsource knew or should reasonably have known that they did not; and

c.    Omitting necessary information about the types of fees it would charge and when those fees would be charged.

92.    Mainsource's violations were willful and were done as part of a scheme, artifice, or device with intent to defraud or mislead, and therefore are incurable deceptive acts under the DCSA.

93.    The DCSA provides that "[a] person relying upon an uncured or incurable deceptive act may bring an action for the damages actually suffered as a consumer as a result of the deceptive act or five hundred dollars ($500), whichever is greater. The court may increase damages for a willful deceptive act in an amount that does not exceed the greater of: (1) three (3) times the actual damages of the consumer suffering the loss; or (2) one thousand dollars ($1,000)." Ind. Code § 24-5-0.5-4(a).

94.     The DCSA provides that "[a]ny person who is entitled to bring an action under subsection (a) on the person's own behalf against a supplier for damages for a deceptive act may bring a class action against such supplier on behalf of any class of persons of which that person is a member . . . ." Ind. Code § 24-5-0.5-4(b).

95.     Had Plaintiff and members of the Class been aware that they were going to be charged OD Fees in the manner Mainsource assessed them, Plaintiff and members of the Class would not have entered into the transactions that purportedly caused the OD Fees and would not have incurred the additional fees.

96.     As a direct and proximate result of Mainsource's unfair and deceptive acts and practices in violation of the DCSA, Plaintiff and members of the Class have incurred more OD Fees than they should have and have suffered monetary damages for which Defendant is liable.

97.     Plaintiff and members of the Class seek actual damages plus interest on damages at the legal rate, as well as all other just and proper relief afforded by the DCSA. As redress for Defendant's repeated and ongoing violations, Plaintiff and members of the Class are entitled to, *inter alia*, actual damages, treble damages, attorneys' fees, and injunctive relief.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff and the Class demand a jury trial on all claims so triable and judgment as follows:

A.     Certification for this matter to proceed as a class action under Fed. R. Civ. P. 23(b)(2) and 23(b)(3);

B.     Restitution of all improperly assessed OD Fees paid to Mainsource by Plaintiff and the Class, as a result of the wrongs alleged herein in an amount to be determined at trial;

C.     Actual damages in an amount according to proof;

D.    Pre-judgment interest at the maximum rate permitted by applicable law;

E.    Costs and disbursements assessed by Plaintiff in connection with this action, including reasonable attorneys' fees pursuant to applicable law;

F.    For attorneys' fees under the DCSA, the common fund doctrine, and all other applicable law; and

G.    Such other relief as this Court deems just and proper.

**JURY DEMAND**

Plaintiff, by counsel, demands trial by jury.

Dated: May 6, 2020                                 Respectfully submitted,

*/s/Lynn A. Toops*
Lynn A. Toops, No. 26386-49
Lisa M. La Fornara, No. 35280-53
COHEN & MALAD, LLP
One Indiana Square, Suite 1400
Indianapolis, IN 46204
Telephone: (317) 636-6481
Fax: (317) 636-2593
ltoops@cohenandmalad.com
llafornara@cohenandmalad.com

Jeffrey Kaliel*
Sophia Gold*
KALIEL PLLC
1875 Connecticut Ave. NW 10th Floor
Washington, D.C. 20009
(202) 350-4783
jkaliel@kalielpllc.com
sgold@kalielpllc.com

John Steinkamp
**JOHN STEINKAMP &ASSOCIATES**
5214 S East St., Suite D1
Indianapolis, IN 46227
Telephone: (317) 780-8300
Facsimile: (317) 217-1340
John@johnsteinkampandassociates.com

*Counsel for Plaintiff and the Proposed Plaintiff Class*

*\*Pro Hac Vice* Motions to be Filed