UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

GREGORY HASH on behalf of      )
himself and all others similarly )
situated,                      )
                               )      Cause No. 1:20-cv-1321 RLM-MJD
            *Plaintiff*         )
                               )
        v.                     )
                               )
FIRST FINANCIAL BANCORP,       )
                               )
            *Defendant*         )

<u>ORDER</u>

Plaintiff Gregory Hash, a checking accountholder at defendant First Financial Bancorp, sues First Financial on behalf of himself and a putative class for breach of contract (including breach covenant of good faith and fair dealing), and violation of the Indiana Deceptive Consumer Sales Act, Ind. Code § 24-5-0.5-1 *et seq.* The court has jurisdiction under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2) & (6), and the parties agree that Indiana law provides the rule of decision. Mr. Hash alleges that First Financial improperly charged him overdraft fees that weren't authorized by his checking account contract with First Financial. First Financial has moved to dismiss Mr. Hash's complaint for failure to state a claim upon which relief can be granted. The court heard argument on the motion on March 4 and now DENIES First Financial's motion [Doc. No. 17].

## I. **Background**

Mr. Hash's complaint alleges that debit-card transactions occur in two parts. First, when a debit-card holder uses a debit card at the point of sale to complete a transaction, the merchant presents the transaction in real time to First Financial for authorization. If First Financial authorizes the transaction, the transaction will be completed at the point-of-sale. Whether First Financial authorizes or declines a transaction depends on whether (1) enough funds are available in the accountholder's checking account to cover the transaction, or (2) the accountholder elects to have First Financial cover the transaction (causing an overdraft).[1]

Once First Financial authorizes the transaction, the amount of the transaction will be subtracted from the accountholder's available balance, meaning the balance that is available for immediate use. The available balance might differ from an accountholder's current balance, which is the amount of money actually in the account. When a transaction is authorized at the point of sale, a "debit hold" in the amount of the transaction is placed on the accountholder's account and subtracted from the accountholder's available balance. However, the amount of the debit hold isn't subtracted from his current balance during authorization.

---

[1] First Financial includes an overdraft disclosure in their account contract that says First Financial will authorize and pay overdrafts for transactions made using a checking account number and automatic bill payments, but not for ATM transactions and ATH debit card transactions. First Financial will only authorize and pay overdrafts for ATM transactions and ATH debit card transactions if the accountholder is enrolled in the Courtesy Cash Plus service. Mr. Hash was enrolled in the Courtesy Cash Plus service.

Second, the transaction "settles" after it is authorized, meaning that the funds are actually transferred from the accountholder's account to the merchant. The transaction (the amount of the debit hold) is then subtracted from and reflected in the accountholder's current balance.

First Financial charges a $37 overdraft fee if an accountholder overdraws his available balance. According to the parties' account contract, overdrafts "occur when [an accountholder does] not have enough money in [his] account to cover a transaction, but [First Financial pay[s] it anyway."

Mr. Hash filed his complaint challenging First Financial's practice of charging overdraft fees on Authorize Positive, Settle Negative Transactions ("APSN transactions"). An APSN transaction occurs when a transaction is authorized and there are enough funds in the accountholder's available balance to cover the transaction at the point of sale, but later the transaction overdraws the account at settlement, triggering an overdraft fee.

Mr. Hash alleges that these types of transactions should never occur on an account with a positive available balance because debit holds are placed on authorized transactions (effectively sequestering the funds needed to pay the transaction), so there should always be enough money in the account to cover the transactions when they settle. Compl. ¶¶ 11-17. According to the complaint, First Financial breaches the contract because the contract promises to only charge overdraft fees on transactions with insufficient available funds, yet First Financial charges overdraft fees on transactions "for which there are sufficient funds available to cover the transactions throughout their lifecycle." Compl. ¶

3

37. Regarding APSN transactions specifically, Mr. Hash alleges that First Financial uses the same debit-card transaction twice—once at authorization and once at settlement—to determine if the transaction overdraws an account. Compl. ¶ 41-43. This practice allows First Financial to charge overdraft fees on transactions that shouldn't have caused an overdraft because there were sufficient available funds at the time of authorization; as Mr. Hash sees it, the later "pseudo-event" of settlement has no bearing on whether there were sufficient available funds to cover a transaction when it was authorized. Mr. Hash alleges that he was assessed overdraft fees for debit-card transactions even though they were authorized when he had enough funds to pay for them. These overdraft fees are alleged to have violated the parties' contract, the implied duty of good faith and fair dealing, and the Indiana Deceptive Consumer Sales Act. Mr. Hash attached a copy of the contract to his complaint.

To illustrate how a transaction could authorize positive but settle negative, assume you have $10 in your bank account. On day one, you make a $7 purchase that is authorized at the point of sale. The $7 is immediately deducted from your available balance, bringing the available balance to $3, but the transaction will take three days to settle, so your current balance remains at $10. On day two, you make a purchase for $11[2] that settles within hours, bringing your available balance to $-8 and your current balance to $-1. The

_____

[2] This transaction would still authorize (the purchase wouldn't be declined; it would just overdraw the account) if the accountholder was enrolled in Courtesy Cash Plus. Mr. Hash was enrolled in Courtesy Cash Plus.

second transaction prompts an overdraft fee of $37,[3] leaving your available balance at the end of day two at $-45 and your current balance at $-38. On day three, the first $7 purchase finally settles, and the available and current balances are the same at $-45. At this point, First Financial charges another overdraft fee because the $7 transaction settled negative. Mr. Hash challenges this second overdraft fee on the $7 transaction because, at the time of the transaction, he had sufficient funds to pay for the purchase.

Mr. Hash says that the contract actually doesn't allow what the contract calls "Authorize Positive—Settle Negative" transactions; it bars them because First Financial promises to determine overdrafts at the moment of authorization. If overdrafts are determined at the time of authorization, APSN transactions should never trigger an overdraft fee because they are authorized on a positive balance. Mr. Hash also argues that the contract is ambiguous at best as to whether overdraft fees are assessed at authorization or settlement, and because the meaning of an ambiguous contract term is a question of fact that must be answered in favor of the plaintiff at the motion to dismiss stage, Mr. Hash states a claim for breach of contract. First Financial is steadfast that the contract clearly explains that an overdraft occurs if the customer's balance is too low when transactions are presented for permanent payment and settlement, even of there was enough when the transaction was initially authorized.

---

[3] Mr. Hash doesn't dispute the assessment of this first overdraft fee.

## II. <u>**Standard of Review**</u>

A court considering a defendant's motion to dismiss for failure to state a claim on which relief can be granted "take[s] as true all well-pleaded facts and allegations in the plaintiff's complaint, . . . and the plaintiff is entitled to all reasonable inferences that can be drawn from the complaint." <u>Bontkowski v. First Nat. Bank of Cicero</u>, 998 F.2d 459, 461 (7th Cir. 1993). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009). Factual allegations must give the defendant fair notice of the claims being asserted and the grounds upon which they rest and "be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true." <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 545 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Ashcroft v. Iqbal</u>, 556 U.S. at 678. In other words, a complaint must give "enough details about the subject-matter of the case to present a story that holds together." <u>McCauley v. City of Chicago</u>, 671 F.3d 611, 616 (7th Cir. 2011). A pleading that merely offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." <u>Ashcroft v. Iqbal</u>, 556 U.S. at 678.

### III.  **Breach of Contract Claim**

Under Indiana law, "[t]he essential elements of a breach of contract action are the existence of a contract, the defendant's breach thereof, and damages." McVay v. Store House Comp., 289 F. Supp. 3d 892, 896 (S.D. Ind. 2017) (citing McCalment v. Eli Lilly & Co., 860 N.E.2d 884, 894 (Ind. Ct. App. 2007)). To the extent that the allegations in a complaint contradict a contract that is attached to the complaint, the contract "trumps the allegations" and "the court is not required to credit the unsupported allegations." N. Ind. Gun & Outdoor Shows, Inc. v. City of S. Bend, 163 F.3d 449, 454 (7th Cir. 1998). "In fact, a plaintiff may plead himself out of court by attaching documents to the complaint that indicate that he or she is not entitled to judgment." Id. at 455.

The parties agree that a contract exists, but dispute the defendant's breach of the parties' contract. Whether Mr. Hash has alleged a claim upon which relief can be granted depends on whether the contract allows First Financial's challenged conduct. First Financial determined that an overdraft occurred when Mr. Hash's debit-card transactions settled negative even though those transactions authorized positive. So, whether Mr. Hash has stated a claim upon which relief can be granted depends on whether the contract allows First Financial to determine overdrafts when transactions settle.

A court's primary objective when interpreting a contract is "to give effect to the intentions of the parties as expressed in the four corners of the instrument." Allen v. Cedar Real Estate Group, LLP, 236 F.3d 374, 381 (7th Cir. 2001) (citing Fetz v. Phillips, 591 N.E.2d 644, 647 (Ind. Ct. App.1992)).

Interpretation of a contract is primarily a question of law. USA Life One Ins. Co. of Indiana v. Nuckolls, 682 N.E.2d 534, 538 (Ind. 1997). If the contract is "clear and unambiguous, then it should be given its plain and ordinary meaning." Id. "The meaning of a contract is to be determined from an examination of all of its provisions, not from a consideration of individual words, phrases, or even paragraphs read alone." Art Country Squire, L.L.C. v. Inland Mortg. Corp., 745 N.E.2d 885, 889 (Ind. Ct. App. 2001). A "contract term is not ambiguous merely because the parties disagree about the term's meaning." Roy A. Miller & Sons, Inc. v. Industrial Hardwoods Corp., 775 N.E.2d 1168, 1173 (Ind. Ct. App. 2002). "An ambiguity exists only where reasonable people could come to different conclusions about the contract's meaning." Id.; see also Abbey Villas Dev. Corp. v. Site Contrs., Inc., 716 N.E.2d 91, 100 (Ind. Ct. App. 1999) ("A contract is ambiguous when it is susceptible to more than one interpretation and reasonably intelligent persons would honestly differ as to its meaning.").

If the contract contains language that is ambiguous, "then the court may apply the rules of construction in interpreting the language." Id. A patent ambiguity is one that "is apparent on the face of the instrument and arises from an inconsistency or inherent uncertainty of language used so that it either conveys no definite meaning or a confused meaning." Oxford Financial Group, Ltd. v. Evans, 795 N.E.2d 1135, 1143 (Ind. Ct. App. 2003). If the ambiguity in the contract is a patent one, then extrinsic evidence isn't admissible to explain or remove the ambiguity, and the ambiguity presents a question of law. Id. A latent ambiguity is an "ambiguity that arises only upon attempting to implement

the contract, and the meaning of which can only be determined by reference to extrinsic evidence." Id. at 1144. If the ambiguity can't be resolved without the aid of a factual determination, then "the trier of fact must ascertain the facts necessary to construe the contract." *E.g.*, Arrotin Plastic Materials of Indiana v. Wilmington Paper Corp., 865 N.E.2d 1039, 1041 (Ind. Ct. App. 2007); *see also* Felker v. Sw. Emergency Med. Serv., Inc., 521 F. Supp. 2d 857, 867 (S.D. Ind. 2007) ("[T]he fact finder resolves latent ambiguity as a question of fact."). When there is ambiguity in a contract, it is construed against its drafter. MPACYT Const. Group, LLC v. Superior Concrete Constructors, Inc., 802 N.E.2d 901, 910 (Ind. 2004).

First Financial identifies several sections of the contract that it argues unambiguously allow them to charge overdraft fees at settlement on all types of APSN transactions. These sections are analyzed in the sections that follow.

### 1.    "Authorize Positive – Settle Negative" Section

First Financial's primary argument is that the contract's "Authorize Positive – Settle Negative" section makes it clear that overdrafts are determined at the time of settlement. That section reads in relevant part:

> In order to determine whether your account is overdrawn, we use the Available Balance. . . . When you make a point-of-sale transaction, a hold is placed on those funds at the time the transaction is authorized. If a point-of-sale hold expires and the point-of-sale transaction has not yet been paid, the amount being held is then returned to your Available Balance. If the point-of-sale transaction then comes through after the hold expires, because we have already authorized that transaction previously, we will honor the transaction. If you do not have sufficient funds in your account at the time we honor the transaction, the point-of-sale transaction

will cause you to overdraw and, if you are opted into Courtesy Cash Plus, or the debit transaction is a recurring transaction, you may still incur an overdraft fee.

The section goes on to provide an example of how a transaction could be authorized on positive funds yet still settle negative and incur an overdraft fee because a debit hold expired.

Mr. Hash argues that, while the section warns that a certain type of ASPN transaction can incur an overdraft fee, it does so only in the limited circumstance of when the hold expires before the transaction settles. That isn't the only way an ASPN transaction can occur, and that wasn't the type of ASPN transaction Mr. Hash experienced. The holds on Mr. Hash's positively authorized transactions never expired, but were nevertheless charged with an overdraft fee when they settled.

The "Authorize Positive – Settle Negative" section doesn't make it clear that First Financial can charge overdraft fees at settlement on all types of APSN transactions, and the factual scenario in which the section allows First Financial to assess overdraft fees at settlement doesn't apply to Mr. Hash's situation. Furthermore, the section states that First Financial uses the available balance to determine whether an account is overdrawn. The available balance is the balance that is immediately affected when a point-of-sale transaction is authorized. Using the available balance to determine overdrafts implies that overdrafts are determined at authorization, not settlement. The "Authorize Positive – Settle Negative" section of the contract doesn't unambiguously allow First Financial to charge overdraft fees at settlement on every APSN transaction.

10

2.   "Authorize and Pay" Terms

Next, the parties address the meaning of First Financial's use of the terms "authorize and pay." For example, a portion of the contract reads:

> You understand that we may, at our discretion, honor withdrawal requests that overdraw your account as part of our Courtesy Cash service. However, we will only **authorize and pay** overdrafts for ATM transactions or debit transactions if you specifically opted-in to Courtesy Cash Plus service, or there are available funds at the time of authorization.

Mr. Hash argues these terms link authorization with paying overdrafts, appear many times in the contract and tell consumers that transactions are "paid"—creating overdrafts—at the time of authorization. First Financial says that "[t]his language simply details how First Financial's Courtesy Cash overdraft programs work and explains that First Financial will only 'authorize' ATM transactions and debit-card transactions and 'pay overdrafts' for those transactions in two circumstances: (1) if the customer 'opted-in to Courtesy Cash Plus' or (2) if the customer has sufficient available funds at the time of authorization."

This language doesn't help the customer understand whether overdrafts are determined at the time of authorization or settlement. The sentence might explain either of two scenarios. First, if an accountholder opted into Courtesy Cash Plus, First Financial will authorize and pay overdrafts on ATM and debit transactions (instead of declining the transaction at the point of sale). The "benefit" of Courtesy Cash Plus is that ATM and debit transactions that overdraw an account will be authorized instead of being declined. But that doesn't shed

11

light on whether overdraft fees are determined at the time of authorization or settlement.

Second, if an accountholder has sufficient available funds at the time of authorization, First Financial will authorize and pay overdrafts on ATM and debit transactions, regardless of whether an accountholder opted-in to Courtesy Cash Plus. The "and pay overdrafts" portion could imply that overdrafts can occur on ATM and debit transactions authorized on sufficient funds, meaning that overdrafts would be determined at settlement. But the "and pay overdrafts" also could reasonably be read as only applying to the first scenario—when an accountholder opted into Courtesy Cash Plus. The terms are ambiguous and unhelpful in determining if overdrafts are determined at authorization or settlement.

### 3. "Payment Order of Items" Section

First Financial argues that the "Payment Order of Items" section explains its policy is to pay when items are presented for "permanent payment" and explains the order in which various types of transactions are paid, stating repeatedly explains that transactions are paid "on the day presented for permanent payment." The section reads:

> PAYMENT ORDER OF ITEMS – The order in which items are paid from your account is important if there is not enough money in your account to pay all of the items that are presented. The payment order can affect the number of items overdrawn or returned unpaid and the amount of the fees you may be assessed. To assist you in managing your account, we are providing you with the following information regarding how we pay items.

♦ Our policy is to pay items being presented for permanent payment in the following order.

1. Wire transfers – in low to high dollar amount order on the day presented for permanent payment

2. ATM transactions – in low to high dollar amount order on the day presented for permanent payment

3. Debit Card transactions authorized with a PIN (appears as "DBT CRD" on your statement) or a person-to-person payment – in low to high dollar amount order on the day presented for permanent payment

4. Debit Card transactions authorized as a credit transaction (appears as "POS DEB" on your statement) – in low to high dollar amount order on the day presented for permanent payment

5. Recurring Debit Card transactions – in low to high dollar amount order on the day presented for permanent payment

6. Electronic Fund Transfers – in low to high dollar amount order on the day presented for permanent payment

7. Checks paid at the teller window or to an FFB loan – in check number order on the day presented for permanent payment

8. ACH transactions – in low to high dollar amount order on the day presented for permanent payment

9. All other checks – in check number order on the day presented for permanent payment

♦ Note: Items that are temporarily presented as a debit to your account may not permanently be paid in the same order as temporarily presented.

If a check, item or transaction is presented without sufficient funds in your account to pay it, we may, at our discretion, pay the item(s) (creating an overdraft).

The section doesn't unambiguously establish that First Financial can assess overdraft fees at settlement; the section describes the order in which items

presented for permanent payment will be paid. The order in which transactions of the same category are paid is determined by their amount at settlement, but that doesn't clarify whether First Financial determines overdraft fees at authorization or settlement. The Payment Order of Items Section doesn't unambiguously allow First Financial to charge overdraft fees at settlement on every type of APSN transaction.

First Financial also argues that the last sentence of the cited section shows that overdrafts are created when a transaction is presented with too little a balance in the customer's account to pay it. This, First Financial says, is exactly what happens in an APSN transaction.

The strength of this argument depends on whether the word "presented" means "presented at settlement" as opposed to "presented for authorization." Ambiguities exists when reasonable people could differ as to the meaning of a contract. Abbey Villas Dev. Corp. v. Site Contrs., Inc., 716 N.E.2d 91, 100 (Ind. Ct. App. 1999). Because reasonable people can differ as to what "presented" means, this section of the contract doesn't unambiguously allow First Financial to charge overdraft fees at settlement on every APSN transaction.

4.    Overdraft Disclosure

The overdraft disclosure provides that: "An overdraft occurs when you do not have enough money in your account to cover a transaction, but we pay it anyways." First Financial argues that this language makes it clear that overdrafts are determined at settlement. Mr. Hash argues that the words "to

cover" are ambiguous because the sentence doesn't clarify whether an accountholder would need enough money to cover the transaction when it is authorized, or later when it settles.

The overdraft disclosure isn't helpful in determining whether overdrafts are assessed at authorization or settlement. When an account is determined to be overdrawn is left unspecified, and it can't be said one way or the other from the context in which the section appears. The overdraft disclosure doesn't unambiguously establish that First Financial can assess overdraft fees at settlement on every APSN transaction.

### 5.   "Withdrawals" Section

First Financial cites language in the contract's "Withdrawals" section that it says allows First Financial to assess overdraft fees at settlement. The section reads in relevant part:

> An item may be returned after the funds from the deposit of that item are made available for withdrawal. In that case, we will reverse the credit of the item. We may determine the amount of available funds in your account for the purpose of deciding whether to return an item for insufficient funds at any time between the time we receive the item and when we return the item or send a notice in lieu of return. We need only make one determination, but if we choose to make a subsequent determination, the account balance at the subsequent time will determine whether there are insufficient available funds.

First Financial argues that this section allows First Financial to determine the sufficiency of the customer's available funds at any time, or at many multiple times, between First Financial's receipt of the item and First Financial's return of the item or payment and notification to the customer, and specifies that, in

any event, the account balance at the later time decides whether there are insufficient available funds.

The court doesn't read this section the way First Financial does. The section describes how an account's available balance is determined in a very specific context: when an item, once deposited in an account, is returned after the funds from the deposit were already made available for withdrawal. That scenario doesn't apply to Mr. Hash's situation; Mr. Hash didn't allege that he deposited an item that was subsequently returned after the funds of that item were already made available for withdrawal. The "withdrawals" section doesn't unambiguously allow First Financial to determine overdraft fees at settlement on every type of APSN transaction.

* * *

None of the contract sections cited by First Financial unambiguously establish that the contract allows First Financial to determine overdraft fees at settlement on the type of transactions on which Mr. Hash alleges he was improperly charged overdraft fees. The court must draw every reasonable inference in favor of the plaintiff on a motion to dismiss, and because the contract is ambiguous as to when First Financial can assess overdraft fees on Mr. Hash's transactions, that ambiguity must be resolved in favor of Mr. Hash. The contract doesn't foreclose Mr. Hash's complaint, Mr. Hash states a claim upon which relief can be granted, and First Financial's motion to dismiss Mr. Hash's breach of contract claim must be denied.

## IV.  __Breach of the Covenant of Good Faith and Fair Dealing__

Mr. Hash alleges that First Financial breach the covenant of good faith and fair dealing in the contract. Compl. ¶ 82. According to the complaint, First Financial "exploits contractual discretion to the detriment of accountholders" by "unfairly [extracting overdraft] Fees on transactions that no reasonable accountholder would believe could cause [overdraft] Fees." Compl. ¶ 47, 49.

Indiana law imposes a generalized duty of good faith and fair dealing on bank account contracts because banks "offer customers contracts of adhesion, often with terms not readily discernable to a layperson. If the contract is ambiguous . . . then the courts will impose such a duty of good faith and fair dealing." Old Nat. Bank v. Kelly, 31 N.E.3d 522, 531 (Ind. Ct. App. 2015). The implied duty of good faith and fair dealing "requires that a party perform its obligations and exercise its discretion under the contract in good faith. But it does not require a party to undertake a new, affirmative obligation that the party never agreed to undertake." Acheron Med. Supply, LLC v. Cook Med. Inc., 958 F.3d 637, 645 (7th Cir. 2020).

First Financial argues that Mr. Hash's claim for breach of the implied duty of good faith and fair dealing must be dismissed simply because Mr. Hash hasn't stated a claim for breach of contract, and the implied duty of good faith and fair dealing doesn't require First Financial to do anything that the contract doesn't require it to do. First Financial argues that the implied duty of good faith and fair dealing doesn't revise the contract's plain terms.

17

As already discussed, Mr. Hash's complaint states a claim for breach of contract, and the law requires First Financial to perform its contractual obligations in good faith. Because all well-pleaded facts are assumed true and all reasonable inferences on a motion to dismiss are drawn in favor of the plaintiff, Mr. Hash has stated a claim upon which relief can be granted, and First Financial's motion to dismiss Mr. Hash's claim for breach of the implied duty of good faith and fair dealing must be denied.

## V. <u>Indiana Deceptive Consumer Sales Act Claim</u>

The complaint's second claim alleges that Mr. Hash suffered monetary damages as a result of First Financial's "unfair and deceptive acts and practices in violation of the [Indiana Deceptive Consumer Sales Act]." Compl. ¶ 96. Mr. Hash alleges that First Financial made representations about how it assessed overdraft fees on debit card transactions that didn't accurately reflect its true fee practices, and that these violations of the Indiana Deceptive Consumer Sales Act ("the Act") were "done as a part of a scheme, artifice, or device with intent to defraud or mislead, and therefore are incurable deceptive acts under [the Act]." Compl. ¶¶ 91-92.

The Deceptive Consumer Sales Act is "a remedial statute that must be liberally construed and applied to promote its purposes and policies of protecting consumers from deceptive or unconscionable sales practices." <u>Castagna v. Newmar Corp.</u>, 2016 WL 3413770, at *6 (N.D. Ind. June 22,2016) (quoting <u>Kesling v. Hubler Nissan</u>, 997 N.E.2d 327, 332 (Ind. 2013); Ind. Code § 24-5-

0.5-1(a). The Act provides in relevant part that "[a] supplier may not commit an unfair, abusive, or deceptive act, omission, or practice in connection with a consumer transaction. Such an act, omission, or practice by a supplier is a violation of this chapter whether it occurs before, during, or after the transaction. An act, omission, or practice prohibited by this section includes both implicit and explicit misrepresentations." Ind. Code § 24-5-0.5-3(a). The Act defines these representations as deceptive acts:

> (1) That such subject of a consumer transaction has sponsorship, approval, performance, characteristics, accessories, uses, or benefits it does not have which the supplier knows or should reasonably know it does not have.

> (2) That such subject of a consumer transaction is of a particular standard, quality, grade, style, or model, if it is not and if the supplier knows or should reasonably know that it is not.

Ind. Code § 24-5-0.5-3(b). The Act recognizes two types of deceptive acts: "uncured" deceptive acts, and "incurable" deceptive acts. Ind. Code § 24-5-0.5-2(a)(6)-(7). Mr. Hash alleges an incurable deceptive act, which is defined as "a deceptive act done by a supplier as part of a scheme, artifice, or device with intent to defraud or mislead." Ind. Code § 24-5-0.5-2(a)(8). "[F]or actions under the Act that are 'grounded in fraud,' the specificity requirement of Rule 9(B) must be met." McKinney v. State, 693 N.E.2d 65, 71 (Ind. 1998). The pleading requirements of Indiana Trial Rule 9(B) and Federal Rule of Civil Procedure 9(b) are the same. Fed. R. Civ. P. 9(b); Ind. Trial R. 9(B). Federal Rule of Civil Procedure 9(b) states: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."

"The primary purpose of the rule is to give the defendant 'fair notice' of the allegations against it." Thornton v. CMB Entm't, LLC, 309 F.R.D. 465, 468 (S.D. Ind. 2015) (citing Vicom, Inc. v. Harbridge Merch. Servs., Inc., 20 F.3d 771, 777 (7th Cir. 1994)). "This means as a practical matter that [a plaintiff] must identify the 'who, what, when, where, and how' of the alleged fraud." Benson v. Fannie May Confections Brands, Inc., 944 F.3d 639, 646 (7th Cir. 2019). "Conclusory allegations do not satisfy the requirements of Rule 9(b) and subject the pleader to dismissal." Veal v. First Am. Bank, 914 F.2d 909, 913 (7th Cir. 1990).

A claim under the Act "may not be brought more than two (2) years after the occurrence of the deceptive act." Ind. Code § 24-5-0.5-5(b). "Dismissing a complaint as untimely at the pleading stage is an unusual step, since a complaint need not anticipate and overcome affirmative defenses, such as the statute of limitations. But dismissal is appropriate when the plaintiff pleads himself out of court by alleging facts sufficient to establish the complaint's tardiness." Cancer Found, Inc. v. Cerberus Capital Mgmt., L.P., 559 F.3d 671, 674-675 (7th Cir. 2009).

The Act's statute of limitations is governed by an occurrence rule that is "'triggered by the date of each occurrence' of a deceptive act." Elward v. Electrolux Home Products, Inc., 264 F. Supp. 3d 877, 892 (N.D. Ill. 2017) (quoting State v. Classic Pool & Patio, Inc., 777 N.E.2d 1162, 1166 (Ind. Ct. App. 2002)). However, "the doctrine of fraudulent concealment can toll the statute of limitations when the defendant has "committed concealment or fraud of such character as to prevent inquiry, to elude investigation, or to mislead the plaintiff,

such as by concealing material facts so as to prevent the plaintiff from discovering a potential cause of action." Id. at 890 (citing Doe v. Shults-Lewis Child and Services, Inc., 718 N.E.2d 738 (Ind. 1999)).

First Financial argues that Mr. Hash's claim for violations under the Act should be dismissed for three reasons. First, First Financial argues that assessing overdraft fees on ASPN transactions can't be a deceptive act because the contract allows First Financial to assess overdraft fees on APSN transactions. But as discussed in Part III, the contract's plain terms don't unambiguously make it clear that First Financial can assess overdraft fees on all APSN transactions.

Second, First Financial argues that the complaint lacks the particularity needed to plead a plausible claim for an incurable' deceptive act, and that Mr. Hash substitutes conclusory and legal conclusions for the factual allegations Rule 9(b) requires. But the complaint provides:

- a detailed explanation of the fee practice challenged (Compl. ¶¶ 11-17);

- a detailed overview of the way First Financial allegedly processes debit-card transactions (Compl. ¶¶ 23-28);

- citations to contractual representations at issue (Compl. ¶ 30-31);

- descriptions of the way First Financial's actual practices allegedly differ from those representations (Compl. ¶ 37-45, 91); and

- specific transactions for which First Financial allegedly charged improper overdraft fees (Compl. ¶ 60).

The complaint's factual allegations are more than sufficient to identify the who, what, when, where, and how of Mr. Hash's fraud claim, giving First Financial fair notice. In particular, paragraphs 43-46 read:

> 43. Upon information and belief, something more is going on: at the moment a debit card transaction is getting ready to settle, [First Financial] does something new and unexpected during its nightly batch posting process. Specifically, [First Financial] releases the hold placed on funds for the transaction for a split second, putting money back into the account, then re-debits the same transaction a second time.

> 44. This secret step allows [First Financial] to charge OD Fees on transactions that never caused an overdraft—transactions that were authorized into sufficient funds and for which [First Financial] specifically set aside money to pay them.

> 45. This discrepancy between [First Financial's] actual practices and the contract causes accountholders to incur more OD Fees than they should.

> 46. In sum, there is a huge gap between practices as described in the account documents and [First Financial's] actual practices.

A plaintiff generally can't satisfy the particularity requirement of Rule 9(b) with a complaint filed on information and belief, but that rule isn't ironclad: "the practice is permissible, so long as (1) the facts constituting the fraud are not accessible to the plaintiff and (2) the plaintiff provides 'the grounds for his suspicions.'" Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co., 631 F.3d 436, 442 (7th Cir. 2011). Mr. Hash satisfies both requirements because the method by which First Financial actually determines and assesses overdraft fees isn't accessible to him, and he has provided grounds for his suspicions—namely, that he was charged overdraft fees on transactions even though he had sufficient available funds to pay for those transactions.

22

Finally, First Financial argues that Mr. Hash's claim is based on overdraft fees assessed in 2015, nearly five years before he filed suit, so the Deceptive Consumer Sales Act's two-year statute of limitations bars his claim. Mr. Hash responds that the Act's statute of limitations should be tolled because First Financial committed incurable deceptive acts with the intent to defraud. He says, too, that tolling is proper because First Financial's violations of the Act are ongoing and continue to occur into the present because the allegedly improper overdraft fees are part of a larger scheme that continued from month-to-month and was deceptive.

With respect to Mr. Hash's first argument, he alleges a "scheme to defraud" that involved a "secret step" that allowed First Financial to charge improper overdraft fees. Compl. ¶ 43-46, 92. But the assessment of overdraft fees at settlement wasn't hidden; overdraft fees were allegedly determined at settlement and charged in violation of what was allowed under the contract. If the court were to find that "concealment" was sufficiently pleaded to toll the statute of limitations, the concealment would have to lie in the mechanics of how exactly First Financial assessed overdraft fees at settlement, not that overdraft fees assessed at settlement were unknown or hidden. It's too great a stretch to say that this is "concealment or fraud of such character as to prevent inquiry, to elude investigation, or to mislead the plaintiff, such as by concealing material facts so as to prevent the plaintiff from discovering a potential cause of action." Elward v. Electrolux Home Products, Inc., 264 F. Supp. at 890 (citing Doe v. Shults-Lewis Child and Services, Inc., 718 N.E.2d 738 (Ind. 1999)).

Mr. Hash's other argument supporting that his claims aren't time-barred is more availing: First Financial's violations of the Act are ongoing and continue to occur into the present because the improper overdraft fees are part of an ongoing scheme to defraud. The two relevant paragraphs from the complaint pertaining to an ongoing scheme are:

> 92. [First Financial's] violations were willful and were done as part of a scheme, artifice, or device with intent to defraud or mislead, and therefore are incurable deceptive acts under the DCSA.
>
> ***
>
> 97. Plaintiff and members of the Class seek actual damages plus interest on damages at the legal rate, as well as all other just and proper relief afforded by the DCSA. As redress for Defendant's repeated and ongoing violations, Plaintiff and members of the Class are entitled to, inter alia, actual damages, treble damages, attorneys' fees, and injunctive relief.

Compl. ¶¶ 92, 97. This is enough to plead an ongoing scheme that would toll the two-year statute of limitations. *See, e.g.*, IUE-CWA Local 901 v. Spark Energy, LLC, 440 F. Supp. 3d 969, 975 (N.D. Ind. 2020). First Financial responds that, by pleading an ongoing scheme, Mr. Hash has created a different problem—that he hasn't sufficiently pleaded the "when" requirement of Rule 9(b). Whether the "when" requirement of Rule 9(b) is pleaded with sufficient particularity depends on whether Mr. Hash's pleadings that he was charged improper and fraudulent overdraft fees in October 2015 in conjunction with his pleadings in paragraphs 92 and 97 are specific enough to allege that the fraud occurred within the past two years. Because Mr. Hash is entitled to every reasonable inference on a motion to dismiss, and because the Act is "a remedial statute that must be liberally construed and applied to promote its purposes and policies of protecting

consumers from deceptive or unconscionable sales practices," Mr. Hash has met the pleading requirements of Rule 9(b) to state a claim for fraud upon which relief can be granted. <u>Castagna v. Newmar Corp.</u>, 2016 WL 3413770, at *6 (N.D. Ind. June 22,2016) (quoting <u>Kesling v. Hubler Nissan</u>, 997 N.E.2d 327, 332 (Ind. 2013)); *see also* Ind. Code § 24-5-0.5-1(a).

## VI.  **Conclusion**

For the foregoing reasons, the court DENIES First Financial's motion to dismiss [Doc. No. 17].

SO ORDERED.

ENTERED:  March 8, 2021

/s/ Robert L. Miller, Jr.
Judge, United States District Court

Distribution: All electronically registered counsel of record